STATE OF IOWA, Appellant, v. FRANCIS KELLEY, Appellee.

**CRIMINAL LAW:** Corpus Delicti. Corpus delicti may be established by circumstantial evidence. So held as to a charge of larceny.

*Appeal from Johnson District Court.*—FRANK F. DAWLEY, Judge.

FEBRUARY 14, 1922.

THE defendant was indicted for the crime of larceny. The court directed a verdict in favor of the defendant, and the State appeals.—*Reversed.*

*Ben J. Gibson,* Attorney General, *C. M. Miller,* County Attorney, and *Frank F. Messer,* Special Counsel, for appellant.

*Dutcher, Davis & Hambrecht,* for appellee.

FAVILLE, J.—The defendant was indicted by the grand jury of Johnson County, charged with the crime of larceny of two heifers, of the value of $140. It was alleged that the crime was committed on or about the 10th day of September, 1920.

The prosecuting witness, one Shaffer, is a farmer, residing in Johnson County, Iowa. About a mile and a quarter from the farm where he lives, Shaffer owned a 40-acre tract, which he used as pasture. This tract was adjacent to a tract owned

by the defendant, and some distance removed from the defend-
ant's buildings. Shaffer's 40-acre tract was rectangular, and
was divided into two pastures. The eastern portion, which was
the larger, was known as the "cattle pasture," and the western
part as the "horse pasture." The accompanying plat will aid
in an understanding of the evidence in regard to the transac-
tions in question.

PLAT OF SECTION 30, TOWNSHIP 79 N, RANGE 8 W.

In September, 1920, Shaffer was pasturing sixteen head of
cattle in the cattle pasture, and a number of horses, but no
cattle, in the horse pasture. It was the habit of Shaffer to visit
these cattle from time to time, to salt them and to observe their
condition. He had done so about September 1st, and at that
time there were sixteen cattle in the lot. These cattle had been
together for a long time. On September 12, 1920, Shaffer again

returned to the cattle pasture, and when he counted his herd, he found that two heifers were missing, one red and one black. He immediately made an investigation along the fences of the pasture, and failed to find any evidence indicating any place where the cattle had escaped from his field. Later the same day, he returned to the pasture and examined the fences again, but discovered no place where it was apparent that any cattle had passed through. Later the same day, he again returned to the pasture and again made an examination, in an endeavor to discover how the two heifers had escaped from the field. As shown on the plat, there is a small creek or slough north of the cattle pasture fence and somewhat parallel thereto. North of this creek was the defendant's cornfield. It appears from the evidence that there was considerable slough grass and weeds along this creek and the space of ground between the cattle-pasture fence and the south line of the defendant's field of corn. For some considerable distance from the northeast corner of the cattle pasture to the west, the fence was in poor condition. The evidence showed that Shaffer examined the fence and also the weeds and grass north thereof, and found no evidences that any cattle had passed from the pasture through the fence. There was a gate between the cattle pasture and the horse pasture, near the southwest corner of the cattle pasture. On his last examination of the fences on the day in question, Shaffer discovered, according to his testimony, that the wire fastening this gate had been tampered with; that it was not fastened at the same place and in the same manner in which he had left it, the last time he had visited the pasture. It will be observed from the plat that there is a creek running across the horse pasture near the east side thereof, and there is a ford across the creek, as indicated on the plat. Shaffer's evidence is to the effect that he followed along this creek, going northward, in making his examination, and that, when he reached this ford, he discovered cattle tracks on the east bank, going in a northwesterly direction and passing up from the ford upon the sod of the pasture on the opposite side of the creek. He followed the general direction of these tracks, and went to the fence which separates the horse pasture from the west cornfield of the defendant, and claims that he then found red cattle hairs on a barb of the top

wire of this fence. He also testified that at that time he observed that a staple had been removed from the post, and that the wire had been laid on a sliver on the side of the post. There is evidence to the effect that the condition of the rust indicated that the staple had been recently drawn. The witness testified that, about five feet north of this place, he found cattle tracks in defendant's field. He testified that it appeared as if the tracks at the ford and also in the cornfield had been made by two cattle. In the cornfield he also discovered the tracks of a horse with the cattle tracks, and that these indicated that all the animals were going in a northerly direction toward the defendant's buildings. He followed all of these tracks for some distance into the cornfield. He also testified that he observed that the weeds and grass had been broken down near the fence where the tracks were. It appeared that the cattle tracks were fresh. The witness testified that, after following the tracks some distance into the cornfield, he then returned to the horse pasture and examined the creek bed, and found no other cattle tracks anywhere except at the places referred to. It being about dark at the time these examinations were concluded, the witness returned to his home; and, having ascertained that the defendant had shipped a carload of cattle from Oxford by freight, which left Saturday night or early Sunday morning, Shaffer immediately went to Chicago by train, arriving there Monday morning. He found the defendant sitting on a fence in the stockyards. He told the defendant of having missed two of his heifers, and that he thought they might be mixed with the defendant's cattle. He also told him about tracking the cattle into the defendant's cornfield, and about finding the hairs on the fence. He then went into the lot where the defendant's carload of cattle were, and picked out and identified his two heifers in question. He testified that at that time the defendant said to him that he (defendant) "didn't see how in hell he could have got them mixed with his bunch." There was some discussion about the witness's shipping the cattle back to Oxford, and it was finally agreed by the parties that the defendant should give the witness $70 each for the cattle and half of his expenses to Chicago, amounting to a total of $145. The witness also testified that at no time in Chicago did the

defendant make any statement as to how the two heifers came into his possession, except the statement above quoted.

This witness was corroborated somewhat by other witnesses, in regard to the cattle and horse tracks that were discovered, and the condition of the fence and the grass and weeds, and generally with respect to the physical aspect of the pastures and the fences and adjacent fields.

The foregoing is the substance of the testimony that was admitted in evidence by the court, and upon which the motion for a directed verdict in behalf of the defendant was sustained.

I.   The general ground of the motion for directed verdict was that the evidence was insufficient to establish the *corpus delicti*.   We think the court was in error in sustaining this motion for a directed verdict.   In a long line of cases, we have held that the *corpus delicti* may be proven by circumstantial evidence, and that, where the circumstances proven are such that a jury may fairly find beyond a reasonable doubt that a crime has been committed, it is error for the court to direct a verdict. *State v. Keeler,* 28 Iowa 551; *State v. Lillard,* 59 Iowa 479; *State v. Day,* 60 Iowa 100; *State v. Rodman,* 62 Iowa 456; *State v. Minor,* 106 Iowa 642; *State v. Millmeier,* 102 Iowa 692; *State v. Westcott,* 130 Iowa 1; *State v. Alley,* 149 Iowa 196.   The rule is also generally recognized in other jurisdictions.

It is unnecessary for us to repeat the salient points of the evidence which we have already referred to.   There was sufficient in this record from which a jury might have been warranted in finding that the cattle in question had been stolen from the premises of the witness Shaffer.   The court was, therefore, in error in directing a verdict in behalf of the defendant, on the ground that the *corpus delicti* had not been proven.

II.   The appellant insists that the court erred in the admission of testimony.   This appeal being by the State, there can be no retrial of the cause, and the questions arising upon the rulings on testimony are not such as require any pronouncement on our part.

From the foregoing it follows that the action of the lower court in directing a verdict must be reversed; but inasmuch as no further proceedings can be had in the trial court, there will be no order of remand.—*Reversed.*

Stevens, C. J., Evans and Arthur, JJ., concur.