STATE OF IOWA, appellee, v. SANFORD WESSON, appellant.

No. 52016.

(Reported in 149 N.W.2d 190)

 

MARCH 7, 1967.

 ──

Sanford Wesson, pro se.

Richard Turner, Attorney General, Ted F. Fay, Jr., Assistant Attorney General, and Ray Fenton, County Attorney, for appellee.

LARSON, J.—Pursuant to a plea of not guilty to a July 28, 1965, indictment which charged defendant with the crime of breaking and entering, in violation of section 708.8, Code 1962, his trial before a jury began on September 27, 1965. He was found guilty and sentenced to a term not to exceed ten years in the State Penitentiary. When his motion for a new trial was overruled on October 14, 1965, he appealed. He had the benefit of counsel throughout these proceedings and was offered counsel to aid in this appeal, but apparently was not satisfied with the efforts extended in his behalf and chose to present this appeal pro se. In so doing, he failed to file a written abstract of the record, and reference to the record made in the briefs and arguments is to the approximately 250-page transcript filed herein. Nevertheless, in view of the contention that he did not receive a fair trial, we have carefully reviewed and considered this transcript of the proceedings in the trial of this case.

334

Appellant's grounds for reversal, as we understand him, are : (1) that the trial court erred in refusing to direct a verdict for him at the close of the State's case and at the termination of all evidence, for the reason that there was insufficient competent evidence before the court to support a verdict against him (2) that he received inadequate legal representation from his court-appointed counsel, and (3) that he failed to receive a fair trial due to prejudicial remarks and statements by the prosecuting attorney during the trial and during his closing argument before the jury. He complains of leading and improper questions, unchallenged by his attorney during the trial, and the allowance of jury consideration of an improperly-designated "Exhibit Q". We find no reversible error and affirm the conviction.

I. The rules governing our consideration of a claim of insufficient evidence to support a conviction need little elaboration here. The evidence is to be viewed in the light most favorable to the State. It is the fact finder's function, not ours, to decide disputed questions of fact and to draw permissible inferences therefrom, and its finding is binding upon us unless we are satisfied it is without substantial support in the evidence or is clearly against the weight thereof. State v. Stodola, 257 Iowa 863, 134 N.W.2d 920, 921; State v. Frink, 255 Iowa 59, 63, 64, 120 N.W.2d 432, 435; State v. Poffenbarger, 247 Iowa 552, 554, 74 N.W.2d 585, 586, and citations; State v. Harless, 249 Iowa 530, 531, 532, 86 N.W.2d 210, 211.

II. The charge of breaking and entering is usually based upon circumstantial evidence—evidence which tends to prove a fact in issue by proof of collateral facts from which it may be reasonably and logically deduced that the alleged ultimate fact exists. A wide latitude is generally allowed in admitting circumstantial evidence in one's trial where direct evidence is lacking to establish one's theory. Although the trial court has considerable discretion in ruling on circumstantial evidence, it must be such as to lead to a reasonable inference of participation and not to a mere suspicion of the existence of facts sought to be proven. State v. Myers, 248 Iowa 44, 52, 79 N.W.2d 382, and citations; State v. Ford, 259 Iowa 744, 145 N.W.2d 638, 641, and citations. Mere presence at the scene of a crime, of course, is not

enough to prove defendant committed the offense or that he did aid and abet its commission. State v. Jones, 259 Iowa 375, 144 N.W.2d 120, 123, and citations; State v. Daves, 259 Iowa 584, 144 N.W.2d 879, 881, and citations. The evidence here revealed much more than mere presence at the scene of this crime, but with these rules in mind we now give our attention to the record.

Shortly before 2 a.m. on April 23, 1965, a police officer in an unmarked car noticed a Nebraska licensed automobile parked on the east side of East Second Street just off Locust Street in Des Moines, and a Negro man, later identified as defendant, at the entrance to the alley extending westward to the rear of a building known as Union Hall. The officer circled around several blocks and stopped his car behind the Nebraska car. Defendant had disappeared, but the officer saw another man in the alley near the rear of Union Hall and attempted to approach him without being seen. He failed, and that man also disappeared. Returning to his car, the officer radioed for aid in locating the subjects. A second officer in a different patrol car picked up defendant a few blocks to the east on Grand Avenue. He was returned to the area of the Nebraska car, but denied any knowledge of this car or of the impropriety of his presence at that time in the neighborhood.

An investigation of the area nearby revealed the front door of Union Hall at 118 East Locust Street had been forced, apparently with a screwdriver, the locked door leading to the office of the Plasterers and Cement Masons, Local 21, therein had been likewise forced, and a cabinet had been broken open. Two typewriters were missing. Further investigation revealed other offices had also been entered, the rear door next to the alley had been forced from the inside, and an additional electric typewriter upside down was found on a table near the rear door. A portable typewriter, later identified as one taken from Union Hall, was found on the back seat of the Nebraska car, and two screwdrivers were found on the floor of the car opposite the driver's side.

There was evidence produced by the State that revealed defendant, when apprehended, was wearing dark or tinted glasses, a dark-colored dress hat, and a three-quarter-length coat made of a material similar to deerskin. In the coat pocket was a pair of

gloves. A free parking token, issued by the Brown Hotel in Des Moines, was later found on appellant's person.

In response to police inquiry as to his business in that locality at that time, defendant told the officers he had just arrived by bus from Omaha, that he had been told there was a chicken shack eating house over by the Statehouse and he was trying to find it, that he knew no one by the name of Jack Weaver, the person named on the registration card in the Nebraska automobile found on East Second Street, and that he was alone.

At the trial it was established defendant and another taller Negro man checked in at the Brown Hotel, located at West Fourth and Keo, at 1:23 a.m., April 23, 1965, without luggage. Defendant signed the register for both, listing the other person as Jack Weaver. On inquiry as to where to park, defendant was given a free parking token, good at the adjoining parking lot. Some 15 to 20 minutes later these men left the hotel, they said to get something to eat. The bellboy recommended the Savery Hotel two blocks south of the Brown. Approximately two hours later the taller man returned alone.

An immediate examination of the Nebraska automobile had revealed a warm motor. A later examination revealed several fingerprints on the right front side in the car and a fingerprint and palm print just over the right front door. There was evidence these prints matched those of defendant taken later that morning at the police station. The two screwdrivers found on the floor of the Nebraska car fit perfectly in the indentations made by the party or parties who forced the doors in Union Hall.

One of the typewriters taken from the hall was found on the Des Moines River bridge some two or three blocks west of Union Hall.

From this factual evidence we think the jury could properly infer that these men drove to that area from the Brown Hotel, forced the doors with those screwdrivers, that defendant had carried one typewriter to the car and was returning for another when the patrolman saw him, that his associate, with a second typewriter, observed the approaching patrolman, took off westward, and left his loot on the river bridge. Defendant, on the other hand, after spotting the investigating officer, tried to escape

eastward. He was apprehended by another alert officer. Apparently that is what the jury found, and we cannot say its findings were unsupported in this record. The evidence of the State, which must be viewed in a light most favorable to the State, was substantial and, if believed, was sufficient to support a conviction beyond a reasonable doubt. State v. Agee, 257 Iowa 1345, 1348, 136 N.W.2d 419, and citations.

In an effort to avoid implication as a participant in this offense, defendant took the stand in his own behalf. His story was that he had arrived in Des Moines by bus at 3 p.m., April 22, 1965, to attend the Drake Relays, that he was unable to find a room in the Franklin Hotel where he usually stayed when in Des Moines, and that he visited the Center Street area around 8 p.m. In the vicinity of a tavern he saw a Nebraska automobile he recognized as belonging to Jack Weaver of Omaha. He did not find Weaver, but found a person he knew as James Arthur from Omaha, who said he had borrowed the car from Weaver. They were together off and on until 11:30 or 12 p.m. Thereafter defendant said they went in search of a room, as far away as South Fleur Drive, with no success. At the Savery Hotel they were advised the Brown could furnish them a room and they took it. He admitted he signed for both parties, using the name Jack Weaver for his associate, and paid for the room in advance. He admitted he asked about parking and got a free parking token. He testified they asked about a place to eat and said they were looking for such a place when Arthur drove over on the east side of the river, that when they reached this vicinity, Arthur said, " 'Well, wait a minute, San, I have got a run to make.' " He parked on Second Avenue and left the car, walking west across a vacant lot toward the alley behind Union Hall. He also said he remained in the car until he had to urinate and he went into the Chrysler car lot to the east to do so. He had noticed the box on the back seat of the car, but had said nothing about it to Arthur. About this time he noticed the police officer drive up, stop, get out, and start toward the vacant lot and alley westward. He then heard a sudden noise in the alley, thought something was wrong, and hastily walked north to Grand Avenue and then east on Grand until he was apprehended by another

officer near East Fifth and Grand. He denied knowledge of the breakin and larceny of the typewriters. His flight, he explained, was because of his past record of several felony convictions.

This evidence generates something more than mere suspicion, speculation or conjecture, and as all essential elements of the crime charged appear, the verdict cannot be disturbed by us. State v. Mabbitt, 257 Iowa 1063, 135 N.W.2d 525, 528; State v. Myers, supra.

Clearly the jury did not believe defendant's story that he was an innocent bystander. Whether it believed he was an actual participant or an aider and abettor we do not know, but under our statute the distinction between principal and accessory has been abrogated. Section 688.1, Code 1962. We conclude evidence appears which raises a fair inference that defendant directed and participated in this offense and that he knew of it even if he did not actively take part therein. State v. Kneedy, 232 Iowa 21, 28, 3 N.W.2d 611, 615. It would justify a finding that he lent aid and encouragement by actual participation in the removal of the goods taken. State v. Fonza, 254 Iowa 630, 118 N.W.2d 548.

There is far more evidence of participation here than in State v. Daves, supra. Here we have direct evidence that he first lied about his presence at the scene of the crime, of his flight, and of his possession of property taken from the building entered. There is evidence of his association with another with a common purpose to commit a crime, both before and after the act was committed. State v. Miller, 259 Iowa 188, 142 N.W.2d 394. We are satisfied it was sufficient to sustain this conviction.

III. Defendant, of course, was entitled to effective assistance of counsel and to receive a fair trial. As we pointed out in the recent case of Scalf v. Bennett, 260 Iowa 393, 147 N.W.2d 860, these rights are assured under the provisions of Amendment 6, section 1, of Amendment 14 to the Constitution of the United States, and Article I, sections 9 and 10, of the Iowa Constitution. It has been passed on and approved many times in both Federal and Iowa decisions. See Powell v. Alabama, 287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527; Gideon v. Wainwright, 372 U. S. 335, 83 S. Ct. 792, 9 L. Ed.2d 799, 93 A. L. R.2d 733;

State v. Myers, supra; State v. Lowder, 256 Iowa 853, 859, 860, 129 N.W.2d 11, 15.

We have also pointed out that "effective" does not mean successful. In Scalf we referred to State v. Myers and Birk v. Bennett, 258 Iowa 1016, 1019, 141 N.W.2d 576, 578, for its generally accepted meaning. We said: "It means conscientious, meaningful representation wherein the accused is advised of his rights, and [where] honest, learned and able counsel is given a reasonable opportunity to perform the task assigned to him. * * *

"Improvident strategy, bad tactics, mistaken carelessness or inexperience do not necessarily amount to ineffective assistance of counsel. Only in extreme cases where it is shown the trial as a whole was a farce and a mockery of justice will a conviction be set aside because of inadequacy of counsel." Citations need not be repeated here.

It was further pointed out therein that there is a presumption that a court-appointed counsel for an indigent defendant acts properly. See Dorsey v. Gill, 80 App. D. C. 9, 148 F.2d 857; Tibbett v. Hand, 10 Cir., 294 F.2d 68; Kilgore v. United States, 8 Cir., 323 F.2d 369.

The burden of proof was on appellant to establish that his counsel was ineffective and that he did not have a fair trial. State v. Benson, 247 Iowa 406, 410, 72 N.W.2d 438, 440; State v. Myers, supra.

Appellant's complaint appears to be that his counsel did not object to certain questions the State propounded to the witnesses and to certain arguments made to the jury by the prosecutor. It is easy to second-guess an attorney and to criticize his efforts when he was not successful. Although we might agree with some of appellant's contentions as to appropriate objections, there is nothing herein to indicate his counsel deliberately failed to use his best efforts in conducting this defense. We believe it shows conclusively that defendant did have able and honest counsel and that counsel performed his task with skill and fortitude. In any event, we are satisfied defendant has failed to carry his burden of proof in this matter and that the small matters complained of were inconsequential at best.

340

IV. In his final brief point appellant maintains he did not receive a fair trial. This claim is largely predicated upon what he alleges were improper and prejudicial remarks made by the prosecutor in his final argument to the jury. He says references were made to evidence which should not have been admitted, and improper inferences were drawn therefrom. Particular complaint is made to the prosecutor's reply to his own attorney's argument that defendant's fingerprints were not found inside Union Hall. The county attorney told the jury, "Why did he just deny these particular things? To try to get you to think in your minds that the fingerprints should be all over the office? He is a smarter burglar than that; he had those gloves on in there." Evidence as to those gloves, appellant said, should not have been admitted in the trial, and his attorney was derelict in not objecting to the question which solicited that information.

This is a rather new and ingenious argument and no doubt may be used frequently hereafter when the defendant is not acquitted. However, as we have pointed out, it takes a strong showing to sustain a claim that one's counsel was ineffective, and we now hold it takes an even stronger showing that an alleged procedural mistake by counsel has resulted in an unfair trial for the defendant. No such showing was made here.

 It is, of course, defendant's duty to object to offensive or improper remarks made by the prosecuting attorney in his closing arguments, and we have often held he waives his right on appeal on that ground unless he does so. State v. Drosos, 253 Iowa 1152, 114 N.W.2d 526; State v. Alberts, 241 Iowa 1000, 43 N.W.2d 703. In any event, we are not convinced the remarks would constitute reversible error or tend to deprive defendant of a fair trial.

 In jury arguments counsel is entitled to some latitude in analyzing the evidence admitted in the trial, and he may draw conclusions and point out permissible inferences and weaknesses in defendant's testimony. State v. Bell, 235 Iowa 767, 16 N.W.2d 218. True, the trial court has the duty to see that the arguments are kept within proper bounds, and this is especially true when a person is on trial charged with a serious offense. We find no dereliction of that duty here. We have examined the

record carefully and find the remarks complained of, although perhaps prejudicial to defendant's case, were quite proper. They did not amount to reversible error, if error at all, and would not sustain a finding that defendant did not have a fair trial.

V. We have considered all other complaints, including contention that an unidentified exhibit was considered by the jury, and find them without merit. "Exhibit Q", which appellant claims was improperly considered, appears to be actually "Exhibit H", a fingerprint properly identified, introduced and accepted into evidence without exception.

Being convinced defendant has received a fair trial, that he had effective counsel, and that the evidence was sufficient to sustain the jury verdict of guilty, this judgment must be affirmed. —Affirmed.

All JUSTICES concur except THORNTON, J., not sitting.